# EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CARNEY BATES & PULLIAM, PLLC**
Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Attorneys for Plaintiff and the Class*

Electronically FILED by
Superior Court of California,
County of Los Angeles
3/25/2025 7:58 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk

## IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF LOS ANGELES

ROBERT FEEMAN, individually, and on behalf of all others similarly situated,

          Plaintiff,

    vs.

ALBERT CORPORATION, and
ALBERT CASH, LLC,

          Defendant.

CASE NO.:  25STCV08658

**CLASS ACTION COMPLAINT**

1

Plaintiff Robert Feeman, a Chief Petty Officer in the United States Navy ("Plaintiff" or "CPO Feeman"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against Albert Corporation and Albert Cash, LLC (collectively, "Albert" or "Defendant") and alleges as follows:

## I.     NATURE OF THE ACTION

1.     This Complaint seeks to protect active-duty military service members from Albert's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1638 ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Albert makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

2.     Albert is in the business of short-term, payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay Albert principal and finance charges (including expedite fees) six days later. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as having "no interest," in practice, Albert routinely takes in ***triple***-digit finance charges from its borrower customers. Defendant issued Plaintiff these predatory loans, with several exceeding **400%** military APR, more than eleven times the legal limit. The end result is a financial product that extracts exorbitant fees from borrowers, encourages serial usage and dependance on the costly loans, worsens borrowers' financial circumstances, and traps them in a cycle of debt.

3.     CPO Feeman has used "Albert Instant"—a cash advance product offered by Albert—during the class period. By virtue of, *inter alia*, the sky-high fees charged for these cash advance loans, Albert has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA and TILA.

4.      Borrowing money that is repaid less than a week later is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's "Albert Instant" transactions are extensions of consumer credit.

5.      In violation of the MLA, Defendant uses its Albert Instant product to saddle Covered Members with charges that yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.      Albert's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a class action and jury trial waiver; and (4) including a mandatory binding arbitration clause. 10 U.S.C. § 987(b), (c) & (e)(1)(2)(5)(6).

7.      Albert systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

8.      Among the abusive lending practices the MLA was designed to curb was predatory short-term payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

3

9.      Albert's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. CPO Feeman seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.    PARTIES

10.     At all times relevant, CPO Feeman was a natural person and resident of Ohio. He has been a member of the U.S. Navy since 2008 and is a currently a chief petty officer stationed at Fort Bragg in North Carolina.

11.     During the class period, CPO Feeman was a Covered Member and an active-duty service member employed by the U.S. Navy.

12.     Defendant Albert Cash, LLC is a Delaware LLC with its principal place of business at 440 North Barranca Avenue, #3801, Covina, CA 91723.

13.     Defendant Albert Corporation is a Delaware corporation with its principal place of business at 440 N. Barranca Avenue, #3801, Covina, California 91723.

14.     Defendant Albert Cash, LLC, is an affiliate of Albert Corporation. Upon information and belief, at all relevant times, Albert Cash, LLC, and Albert Corporation acted as one entity. This complaint therefore refers to Albert Cash, LLC, and Albert Corporation collectively as "Albert."

15.     Albert transacts or has transacted business in this County and throughout the United States. Through its digital-technology platform, including its website and mobile app, Albert has offered, brokered, and extended online installment loans, engaged in the servicing and collections of such loans, and provided other financial products and services to consumers, as described below.

16.     Albert has offered loan agreements to consumers, including Covered Members, since at least 2021, entering into millions of credit transactions.

## III.    TOLLING OF THE STATUTE OF LIMITATIONS

17.     The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, et seq., tolls any and all limitations or repose periods for all active-duty military members, including those

4

similarly situated to CPO Feeman, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## IV.     JURISDICTION AND VENUE

18.     This Court has personal jurisdiction over Defendant because Defendant conducts business in this State and keeps its headquarters in Covina, California.

19.     Additionally, the terms of service for Defendant's "Albert Instant" product provide for exclusive jurisdiction and venue of any dispute relating to Albert's product in the state and federal courts located in the Central District of California. Jurisdiction and venue are therefore proper in this Court.

## V.     LEGAL BACKGROUND

### a.     The MLA Was Specifically Designed to Curb Predatory Short-Term Loans to Covered Members

20.     The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

21.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture and the Uniform Code of Military Justice to which servicemembers are bound make them particularly vulnerable to predatory loans:

---

[5] Report, *supra* n.1.
[6] *Id.* at 10–11.
[7] *Id.* at 11.

Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

22.    While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[9] Those loans, like Albert's, "are delivered and collected online through electronic fund transfer."[10]

23.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Albert's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.
. . .

---

[8] *Id.* at 14. To be sure, EWA providers like Albert do not collect physical checks from their customers at loan initiation but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

[9] *Id.* at 15.

[10] *Id.* at 16.

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.

     (6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

24.    The Report further found "high interest loans, whether provided as a short-term or payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some servicemember victims of predatory loan products experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

25.    Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

26.    To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[16]

27.    The American Bar Association and Navy-Marine Corps Relief Society likewise submitted letters in support of the DoD's request, noting the "urgent need for remedial Congressional action" to curb predatory loan practices harming Service members.[17]

28.    Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

-----

[12] *Id.* at 21–22.
[13] *Id.* at 39.
[14] *Id.* at 41–42.
[15] *Id.* at 46.
[16] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*
[17] *Id.* at 54–56.

b.    **The Military Lending Act**

29.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

30.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

31.    The MLA also requires mandatory disclosures in "consumer credit"[18] transactions with Covered Members, which include:

    a.    A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

    b.    Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

    c.    A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

32.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that requires the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

33.    The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

c.    **The Truth in Lending Act**

34.    The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

---

[18] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

35.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Albert offers here. Albert fails to make any of the following required disclosures:

a. "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

b. "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

c. "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

d. "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

e. "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

f. "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

g. "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

h. "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

i. "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.* at § 1638(12).

## VI.    FACTS

**a.    The Earned Wage Product Market and Albert**

    **i.    EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

36.    A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

37.    Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—was created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

38.    EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages.[19] Loaned funds are repaid via automated withdrawal from the consumer's bank account.

39.    Defendant Albert is a fintech company that provides an EWA product, which it calls "Albert Instant." Albert markets its product as a cash advance with statements like: "Set up Instant to advance up to $250 in minutes."

40.    To repay these loans, users must authorize Albert to charge their debit card or initiate an electronic fund transfer from a bank account. According to its terms of service, cash advance repayments are "due six (6) days from when you initially advance ('**Repayment Period**')."

41.    EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

---

[19] To be sure, cash advance products like Albert's are also offered to individuals who are unemployed but receive regular direct deposits through, for instance, pensions or government benefits.

42.     Albert generally makes money on its Albert Instant product through payment of expedite fees charged for fast access to cash advances.

43.     These expedite fees (which Albert calls "Instant Transfer Fees") are charged to provide instant access to loan funds. For access to cash advances "within minutes," Albert charges a fee ranging from $5.99 to $14.99.

44.     The actual cost to provide customers with instant access to funds is less than $0.05.[20]

45.     The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is for Albert customers a *six-day* liquidity problem.

46.     Albert's website, application, and advertisements include numerous representations about the speed of access to funds, including the very name of the "Albert *Instant*" cash product, as well as promises to deliver funds "in minutes."

47.     While Instant Transfer Fees are notionally optional, in Albert's case, the free option is difficult to access and negates the advances' usefulness to consumers. First and foremost, a consumer wishing to obtain an Albert cash advance into an external bank account (*i.e.*, an account that is not maintained by Albert or its affiliate) ***must*** pay an Instant Transfer Fee. It is impossible for a consumer to receive an Albert cash advance to an external account without paying an Instant Transfer Fee.

48.     Albert purports to offer a fee-free cash advance to users who direct their Albert cash advances to an "Albert Cash" account, which is a "debit card and demand deposit account" offered by Sutton Bank (an Albert affiliate) on Albert's digital platform. Allowing for *free* transfers only for consumers who fundamentally change the way in which they spend money is inconvenient and negates the usefulness of the cash advance product which is designed for users who are in immediate need of money.

---

[20] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

49. Upon information and belief, the vast majority of Albert users pay Instant Transfer Fees when taking out Albert Instant cash advances.

50. When properly viewing EWA products' expedite fees as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

51. A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:

**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

**Wage-based cash advances that don't request tips**
331%

**Wage-based cash advances that request tips**
334%

Payday loans
353%

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

52. The APR received by Albert for its Instant cash product is similar and *often higher*, with some of Albert's loans to Plaintiff exceeding **400%** APR. *See infra.*

53. Ironically, Albert and other EWA providers market their products as low-cost alternatives to payday loans. In truth, Albert is a wolf in sheep's clothing: extending loans with APRs even more expensive than the exorbitantly-priced payday loans it claims to replace.

54. On top of charging loan-shark interest rates, Albert and others limit the amount a borrower can access, while simultaneously allowing multiple advances per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips. Albert limits the amount of funds available through an advance to an amount between $25 and $250 but allows users to "take out additional advances up to your limit" during each Repayment Period.[21]

---

[21] *How does Instant advance repayment work?*, https://help.albert.com/hc/en-us/articles/360041602373-How-does-Instant-advance-repayment-work (last visited Mar. 19, 2025).

Likewise, Albert's six-day repayment period is remarkably brief, resulting in a rapid cycle of "Instant" loans, with repayments and fees depleting borrowers' paychecks and increasing their dependence on more cash advances.

55.    This architecture maximizes fees for EWA providers like Albert, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[22]

56.    The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

57.    A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[23] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

58.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[24]

      **ii.    EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

---

[22] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

[23] Wang, Constantine, Burks, Farahi, *A Loan Shark In Your Pocket*, CENTER FOR RESPONSIBLE LENDING at 7 (Oct. 2024).

[24] Constantine, Bamona, Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING at 6 (Oct. 2024).

59.     While EWA products are financially disastrous for consumers, they have proven profitable for the companies selling them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

60.     "Not all customers will qualify" for Albert Instant cash advances.[25]

61.     To qualify for an Albert Instant loan, borrowers must first access the Albert app or web portal, create an account, and link an "active bank account" with a "long transaction history" to Albert.[26]

62.     To determine whether a borrower is creditworthy, and decide how much credit to extend, Albert requires users to connect their accounts to Albert through Plaid. Plaid is a financial services provider that partners with Albert and other fintech companies to allow them to view customer banking information. Plaid allows Albert to "[q]uickly verify assets and income" of borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[27]

63.     Albert uses its real-time insight into customer financials to ensure borrowers will have sufficient funds to repay their loans at the end of the six-day repayment period (*i.e.*, in the underwriting process). In short, through Plaid, Albert has constantly updating visibility of all transactions in connected accounts to monitor borrowers' financial condition.

64.     Through its access to, and perpetual review of, borrowers' financial accounts, Albert is continually assessing the creditworthiness of its borrowers, and the attendant risk of offering them credit. In determining whether, and how much, credit to extend its borrower customers, Albert considers:

- **Account activity**: an active bank account is linked to Albert

- **Transaction history**: an account with a long transaction history is linked to Albert

---

[25]albert.com (last visited Mar. 19, 2025).

[26] *How do I qualify for advances with Instant?*, https://help.albert.com/hc/en-us/articles/360041602433-How-do-I-qualify-for-advances-with-Instant (last visited Mar. 19, 2025).

[27] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 13, 2025).

- **Direct deposit**: set up qualifying direct deposits with Albert Cash to potentially raise your instant limit[28]

65.    Albert also considers "prior Albert Instant usage and the history and activity of the accounts linked to Albert[.]"[29]

66.    Albert's underwriting process is both rigorous and continual. Albert "regularly review[s] [borrowers'] account[s] to calculate [their] eligibility and may adjust [their] Instant limit. This means [borrowers'] Instant limit may increase or decrease over time." [30]

67.    Again, qualifying for a cash advance is by no means guaranteed and Albert notes on its website that "[n]ot all customers will qualify." Upon information and belief, a substantial proportion of users who seek a cash advance from Albert are denied access based on Albert's assessment (based on its underwriting practices) that the users pose a high default risk.[31]

68.    And for those who qualify, Albert strictly monitors their financial health to determine how much credit the borrowers can take on and reliably repay. Albert determines how much credit to offer its borrowers based on their prior Albert Instant usage and the activity of the accounts linked to Albert. Through its constant underwriting process, Albert extends loans to borrowers only when it is confident they will repay.

69.    For borrowers that qualify, Albert generally begins by offering relatively low amounts of cash, like $25 or $50. Borrowers obtain greater access to credit—*i.e.*, Albert will raise their loan limit—by consistently paying off loans to Albert on time and otherwise improving the health of their linked accounts, by, *i.e.*, earning more money and maintaining a higher balance.

---

[28] *How do I qualify for advances with Instant?*, HELP.ALBERT.COM, https://help.albert.com/hc/en-us/articles/360041602433-How-do-I-qualify-for-advances-with-Instant (last visited Mar. 19, 2025).

[29] *Albert's Terms of Use*, HELP.ALBERT.COM, HELP.ALBERT.COM, https://help.albert.com/hc/en-us/articles/16768060313111-Albert-s-Terms-of-Use#albert-instant (last visited Mar. 19, 2025).

[30] *How do you determine my advance limit?*, HELP.ALBERT.COM, https://help.albert.com/hc/en-us/articles/360041602233-How-do-you-determine-my-advance-limit (last visited Mar. 19, 2025).

[31] For one of Albert's competitors who offers a substantially similar product and utilizes similar underwriting procedures, "approximately 20% [of its users] have been denied access to cash advances entirely." *Fed. Trade Comm'n v. Bridge IT, Inc.*, No. 1:23-cv-09651, Compl., ECF No. 1 (S.D.N.Y. Nov. 11, 2023) ("Brigit FTC Compl.").

70.   Upon information and belief, Albert restricts access to its largest loans to a select few of its borrowers.[32]

71.   These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[33] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like Albert directly review borrowers' financial accounts—is one without a difference.

72.   In addition to these rigorous loan qualification procedures, Albert requires its borrowers to pre-authorize Albert to debit their chosen payment method on the scheduled repayment date. "Advances are due 6 days from when [borrowers] initially advance."

73.   Borrowers must be current on all their prior Albert Instant loans in order to be eligible for an advance.

74.   In sum, Albert's underwriting process requires, before any money changes hands, that borrowers: (1) sign up for an account with Albert; (2) demonstrate they receive qualifying direct deposits from an employer, payroll provider, or benefits provider; (3) link the bank account to which regular deposits are made to Albert through Plaid; (4) authorize Albert to automatically debit the linked accounts in an amount that is equal to the cash advance the borrower receives

---

[32] The Federal Trade Commission found that Albert's competitor, Brigit, offered access to its largest cash advance amount ($250) to "only approximately 1% of Brigit Plus customers." Brigit FTC Compl., ¶ 34.

[33] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

(the principal loan amount) plus fees; and (5) be current on all previous Albert Instant loans. Borrowers who fail to complete each of these steps cannot obtain cash advances.

75.     Additionally, if a borrower is unable to repay a loan, Albert prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

76.     Through these underwriting procedures and policies, Albert ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account at the end of the Repayment Period.

77.     These debt collection methods are so successful that lenders recoup their advances at least 97% of the time using these tactics.[34]

**b.     Albert's Loans to Plaintiff**

78.     Plaintiff CPO Feeman is currently an active servicemember in the U.S. Navy stationed at Fort Bragg in Cumberland County, North Carolina.

79.     He has been an active duty servicemember since 2009 and will remain on active duty until at least 2028.

80.     Albert extended consumer credit to Plaintiff in the form of Instant Cash loan transactions like those discussed above.

81.     CPO Feeman used the loans from Albert for personal, family, or household purposes.

82.     CPO Feeman paid Albert's finance charges, in the form of Instant Transfer Fees to obtain cash-advance loans.

83.     An example of an Albert Instant loan made by Albert to CPO Feeman is shown in the below table, with the estimated cost of credit and MAPR included:

---

[34] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

*Table 1*

| Date Loan Period | Principal Amount | Instant Transfer Fee | APR |
|---|---|---|---|
| 1/3/25–1/9/25 (6 days) | $150.00 | 9.99 | 405% |

84.     CPO Feeman has received multiple usurious loans from Albert since he began using the service.

85.     The Instant Transfer Fees charged with his loans are immediately and directly connected to Albert's extensions of credit to Plaintiff.

86.     Further, Albert's credit agreement required CPO Feeman to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

87.     Albert's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

**c.      Albert Violates the MLA and the TILA**

88.     The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

89.     A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

90.     CPO Feeman and the MLA Class members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

91.     CPO Feeman is a Covered Member with respect to his loan agreements with Albert because he took out the loan while an active-duty service member for personal, family or household purposes.

18

92.     Albert is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Members. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

93.     The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

94.     Albert violates the MLA in at least four distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a class action and jury trial waiver which is prohibited by the MLA; and (4) including a mandatory binding arbitration clause. See, 10 U.S.C. § 987(b), (c), (e)(2), (e)(6)–(7).

95.     As a result of Albert's failure to provide substantially any of the disclosures required by TILA, Albert also violates 15 U.S.C. § 1638.

**VII.    CLASS ALLEGATIONS**

96.     CPO Feeman brings this class action on behalf of himself and all others similarly situated and the general public. The proposed "MLA Class" and the "TILA Class" (collectively the "Classes") are defined as follows:

**MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Albert to use a cash advance product (including Albert Instant), in which Albert was paid a finance charge (including, without limitation, an expedited ("Instant") transfer fee).

**TILA Class**: All individuals in the United States that entered into an agreement with Albert to use a cash advance product (including Albert Instant), in which Albert was paid a finance charge (including, without limitation, an expedited ("Instant") transfer fee).

97.     Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Albert and any entity in which Albert has a controlling interest,

1   or which has a controlling interest in Albert, and its legal representatives, assigns and successors;

2   and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

3       98.   CPO Feeman reserves the right to amend the Class definitions if further

4   investigation and discovery indicates that the Class definitions should be narrowed, expanded, or

5   otherwise modified.

6   **Numerosity and Ascertainability**

7       99.   Plaintiff is unable to state the precise number of members of the Classes because

8   such information is in the exclusive control of Albert. Albert's scheme has harmed and continues

9   to harm the members of the Classes. The members of the proposed Classes are so numerous that

10  joinder of all members is impracticable. Albert has made millions of loans, and CPO Feeman

11  estimates there are, at least many thousands of consumers in the MLA Class and TILA Class. As

12  a result, Plaintiff believes that the total Classes each number in (at least) the thousands, thus

13  members of the Classes are so numerous that joinder of all class members is impracticable. The

14  exact size of the proposed classes, and the identity of the members thereof, will be readily

15  ascertainable from the business records of Albert.

16      100.   The disposition of the claims of these Class members in a single action will provide

17  substantial benefits to all parties and to the Court. Class members are readily identifiable from

18  information and records in Albert's possession, custody, or control.

19  **Commonality**

20      101.   There are common questions of law and fact affecting the rights of each Class

21  member and common relief by way of damages. The harm that Albert has caused or could cause

22  is substantially uniform with respect to Class members. Common questions of law and fact that

23  affect the Class members include, but are not limited to:

24      a.   Whether CPO Feeman and the MLA Class members are Covered Members subject

25          to the protections and limitations of the MLA;

26      b.   Whether Albert is a "creditor" subject to the protections and limitations of the

27          MLA;

28

c. Whether Albert's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

d. Whether Albert entered into standard form loan agreements with Covered Members;

e. Whether Albert's loans exceed the MLA statutory rate cap of 36% MAPR;

f. Whether Albert failed to provide required MLA disclosure in violation of the MLA;

g. Whether Albert's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

h. Whether Albert's standard form loan agreements contain an arbitration clause in violation of the MLA;

i. Whether Albert failed to provide required credit disclosures in violation of the MLA and TILA;

j. Whether each month Albert charged interest to CPO Feeman and Class members it restarted the statute of limitations under the MLA;

k. Whether each month that CPO Feeman and the Class members paid money to Albert it restarted the statute of limitations under the MLA;

l. Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

m. Whether Albert should be enjoined from continuing its lending practices in the manner challenged herein;

n. Whether Albert is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which CPO Feeman and the Classes are entitled under 10 U.S.C. § 987(f)(5); and

o. Any declaratory and/or injunctive relief to which the Classes are entitled.

**Typicality**

102. The claims and defenses of CPO Feeman are typical of the claims and defenses of the MLA Class because CPO Feeman is a Covered Member and his loan agreements with Albert are typical of the type of personal, household, or family loans that Albert normally provides to

Covered Members. Additionally, Albert uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of CPO Feeman are typical of the claims and defenses of the TILA Class. CPO Feeman suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about the Plaintiff's claims.

**Adequate Representation**

103.   CPO Feeman will fairly and adequately assert and protect the interests of the Classes. CPO Feeman has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and CPO Feeman has no conflict of interest that will interfere with maintenance of this class action.

104.   Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Classes.

**Predominance and Superiority**

105.   The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class members' claims in a single stroke. There are no significant individual questions of liability or damages whatsoever, and certainly not ones that predominate over issues common to the Classes.

106.   A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

a.   The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendant when confronted

22

1    with incompatible standards of conduct;

2        b.    Adjudications with respect to individual members of the Classes could, as a

3            practical matter, be dispositive of any interest of other members not parties to such

4            adjudications, or substantially impair their ability to protect their interests; and

5        c.    The claims of the individual Class members are small in relation to the expenses of

6            individual litigation, making a Class action the only procedural method of redress

7            in which Class members can, as a practical matter, recover.

8        107.    Albert has acted and refused to act on grounds generally applicable to the Classes,

9    thereby making declaratory relief and corresponding final injunctive relief under the California

10   Rules of Civil Procedure appropriate with respect to the Classes. Albert should be enjoined from

11   making loans to Covered Members in violation of the MLA and TILA and a declaration should

12   be made that the loans are void from inception.

13       108.    The proposed Classes fulfill the certification criteria of Code of Civil Procedure §

14   382.

15                    **VIII.    CLAIMS FOR RELIEF**

16                        **COUNT I**
                **VIOLATIONS OF MILITARY LENDING ACT**
17

18       109.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in

19   the paragraphs 1-108 above.

20       110.    CPO Feeman brings this claim on behalf of himself and the MLA Class.

21       111.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent

22   of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

23       112.    A "Covered Member" in the statute is a "member of the armed forces who is on

24   active duty under a call or order that does not specify a period of 30 days or less."

25       113.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32

26   C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the

27   consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for

28

1  consumer credit." 32 C.F.R. § 232.4. The MAPR therefore includes the Instant Transfer Fees

2  imposed by Albert.

3      114.  CPO Feeman and the MLA Class members are "Covered Members," subject to the

4  protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the

5  time the consumer becomes obligated on a consumer credit transaction or establishes an account

6  for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered

7  Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

8      115.  CPO Feeman is considered a "Covered Member" with respect to his Albert loan

9  agreements because CPO Feeman is an active duty service member who is obligated by law to

10  repay loans he took out for personal, family or household purposes.

11      116.  Albert is a "creditor" subject to the requirements and limitations imposed by the

12  MLA in that it engages in the business of extending consumer credit to Covered Members

13  protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

14      117.  The underlying loan transactions at issue in this case constitute "consumer credit"

15  subject to the protections and limitations imposed by the MLA because they are "credit offered

16  or extended to a Covered Member primarily for personal, family, or household purposes," subject

17  to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. §

18  232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

19      118.  Albert charged CPO Feeman and the MLA class well above the 36% interest rate

20  cap on their loans, in violation of the MLA.

21      119.  Albert fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and

22  32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

23      120.  Albert's standard form loan agreements include mandatory arbitration agreements

24  in violation of 10 U.S.C. § 987(e)(3).

25      121.  Albert's standard form loan agreements include class action waivers trial waivers

26  in violation of 10 U.S.C. § 987(e)(2).

27      122.  As a result, Albert violates 10 U.S.C. § 987.

28

123.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiff seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

124.    Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiff prays for the relief set forth below.

## COUNT II

### VIOLATIONS OF THE TRUTH IN LENDING ACT

125.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1-108 above.

126.    CPO Feeman brings this claim on behalf of himself and the TILA Class.

127.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Albert's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

128.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

129.    Albert is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

130.    Albert has not provided such disclosures before consummation of the loan agreements.

131.    Albert failed to provide such disclosures to CPO Feeman and the TILA Class.

25

132. As a result, Albert violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

133. Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiff seeks an order from the Court awarding actual damages and statutory damages and attorneys' fees and costs.

WHEREFORE, Plaintiff prays for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, CPO Feeman prays that the Court enter an Order:

a. That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against Albert and in favor of Plaintiff and the Classes on all counts;

c. That the Court find and declare that that CPO Feeman and MLA Class members' standard form loan agreements violate the MLA;

d. That the Court find and declare that Albert violated the MLA and award CPO Feeman and MLA Class members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e. That the Court award CPO Feeman and MLA Class members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. That the Court find and declare that Albert violated TILA and award CPO Feeman and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

g. That the Court enjoin Albert from continuing to engage in predatory lending practices in violation of the MLA and TILA;

h. That Albert be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that Albert be ordered to bear the cost of notice to the absent class members, as well as the administration of any common

1    fund;

2      i.   That the Court award interest as allowable by law;

3      j.   That the Court award reasonable attorneys' fees as provided by applicable law,

4         including under the MILA, the TILA, and/or Code of Civil Procedure § 1021.5;

5      k.   That the Court award all costs of suit; and

6      l.   That the Court award such other and further relief as the Court may deem just and

7         proper.

8

## JURY TRIAL DEMAND

9     CPO Feeman demands a jury trial on all issues so triable.

10

Dated: March 25, 2025            Respectfully submitted,

11

*/s/ Joseph Henry (Hank) Bates, III*
Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

27