**WADE KILPELA SLADE LLP**
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
2450 Colorado Ave., Ste. 100E
Santa Monica, California 90404
Telephone: (310) 396-9600

**JACOBSON PHILLIPS PLLC**
Joshua R. Jacobson (*pro hac vice*
application forthcoming)
joshua@jacobsonphillips.com
2277 Lee Rd., Ste. B
Winter Park, FL 32789
Telephone: (321) 447-6461

**CARNEY BATES & PULLIAM, PLLC**
Joseph Henry (Hank) Bates, III (SBN 167688)
Edwin L. Lowther (*pro hac vice*)
hbates@cbplaw.com
llowther@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505
*Attorneys for Plaintiffs and the Classes*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ROBERT FEEMAN and BRADLEY BAILEY, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALBERT CORPORATION, and ALBERT CASH, LLC,<br><br>Defendant. | CASE NO.: 2:25-cv-03605-MWC-BFM<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

1

Plaintiff Robert Feeman, a Chief Petty Officer in the United States Navy ("CPO Feeman"), and Plaintiff Bradley Bailey, a Sergeant in the United States Army ("Sgt. Bailey"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to themselves and upon information and belief and the investigation of his counsel as to all other matters, and bring this First Amended Class Action Complaint against Albert Corporation and Albert Cash, LLC (collectively, "Albert" or "Defendant") and allege as follows:

## I.    NATURE OF THE ACTION

1.      This Complaint seeks to protect active-duty military service members from Albert's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"), Truth in Lending Act, 15 U.S.C. § 1638 ("TILA"), and the Georgia Payday Loan Act ("PLA"), O.C.G.A. §§ 16-17-2, *et seq.* The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Albert makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

2.      Albert is in the business of short-term, payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay Albert principal and finance charges (including expedite fees and subscription fees) six days later. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as having "no interest," in practice, Albert routinely takes in *triple*-digit finance charges from its borrower customers. Defendant issued Plaintiffs these predatory loans, with several exceeding **700%** military APR, nearly twenty times the legal limit. The end result is a financial product that extracts exorbitant fees from borrowers, encourages serial usage and dependance on the costly loans, worsens borrowers' financial circumstances, and traps them in a cycle of debt.

3.      CPO Feeman and Sgt. Bailey have used "Albert Instant"—a cash advance product offered by Albert—during the class period. By virtue of, *inter alia*, the sky-high fees charged for these cash advance loans, Albert has extended consumer credit to Plaintiffs on numerous occasions in violation of the MLA, TILA, and PLA.

4.      Borrowing money that is repaid less than a week later is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's "Albert Instant" transactions are extensions of consumer credit.

5.      In violation of the MLA, Defendant uses its Albert Instant product to saddle Covered Members with charges that yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.      Albert's consumer credit agreements violate the MLA in at least five ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a class action and jury trial waiver; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. § 987(b), (c) & (e)(1)(2)(5)(6).

7.      And despite Georgia outlawing payday lending, Defendant has offered a short-term, high-cost cash-advance product to Georgia consumers for years. In violation of Georgia law, Defendant has used this product to extract from Georgia consumers charges that yield annual percentage rates ("APRs") drastically exceeding the legal limit.

8.      Albert systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

9.    Among the abusive lending practices the MLA was designed to curb was predatory short-term payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

10.    Albert's business practices violate the MLA, TILA, and PLA, and are part of a systematic nationwide policy and practice. CPO Feeman seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.    PARTIES

11.    At all times relevant, CPO Feeman was a natural person and resident of Ohio. He has been a member of the U.S. Navy since 2008 and is a currently a chief petty officer stationed at Fort Bragg in North Carolina. During the class period, CPO Feeman was a Covered Member and an active-duty service member employed by the U.S. Navy.

12.    Sgt. Bailey is an individual, over 18 years of age. At all times relevant, Sgt. Bailey was a natural person and resident of Fort Stewart, Georgia. He has been a member of the United States Army since 2021. During the class period, Sgt. Bailey was a Covered Member and an active-duty service member employed by the United States Army.

13.    Defendant Albert Cash, LLC is a Delaware LLC with its principal place of business at 440 North Barranca Avenue, #3801, Covina, CA 91723.

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

4

14.     Defendant Albert Corporation is a Delaware corporation with its principal place of business at 440 N. Barranca Avenue, #3801, Covina, California 91723.

15.     Defendant Albert Cash, LLC, is an affiliate of Albert Corporation. Upon information and belief, at all relevant times, Albert Cash, LLC, and Albert Corporation acted as one entity. This complaint therefore refers to Albert Cash, LLC, and Albert Corporation collectively as "Albert."

16.     Albert transacts or has transacted business in this County and throughout the United States. Through its digital-technology platform, including its website and mobile app, Albert has offered, brokered, and extended online installment loans, engaged in the servicing and collections of such loans, and provided other financial products and services to consumers, as described below.

17.     Albert has offered loan agreements to consumers, including Covered Members, since at least 2021, entering into millions of credit transactions.

### III.     TOLLING OF THE STATUTE OF LIMITATIONS

18.     The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, et seq., tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Plaintiffs, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

### IV.     JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Defendant because Defendant conducts business in this State and keeps its headquarters in Covina, California.

20.     Additionally, the terms of service for Defendant's "Albert Instant" product provide for exclusive jurisdiction and venue of any dispute relating to Albert's product in the

state and federal courts located in the Central District of California. Jurisdiction and venue are therefore proper in this Court.

## V.    LEGAL BACKGROUND

### a.    The MLA Was Specifically Designed to Curb Predatory Short-Term Loans to Covered Members

21.    The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

22.    Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture and the Uniform Code of Military Justice to which servicemembers are bound make them particularly vulnerable to predatory loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers.  Every payday loan involves a prospective "bad" check.  Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit.  Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

23.    While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans,

---

[5] Report, *supra* n.1.

[6] *Id.* at 10–11.

[7] *Id.* at 11.

[8] *Id.* at 14. To be sure, EWA providers like Albert do not collect physical checks from their customers at loan initiation but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

6

and 'military loans' via the Internet."[9] Those loans, like Albert's, "are delivered and collected online through electronic fund transfer." [10]

24.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Albert's business model:

> (1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit.  These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

> (2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

> (3) . . . Increasingly the Internet is used to promote loans to Service members.

> (4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower. . . .

> (6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

25.    The Report further found "high interest loans, whether provided as a short-term or payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some servicemember victims of predatory loan products experienced disciplinary action (ranging

---

[9] *Id.* at 15.

[10] *Id.* at 16.

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.

[12] *Id.* at 21–22.

[13] *Id.* at 39.

from reprimands to "loss of promotions and separation from the military") as a result of their

financial hardship.[14]

26.    Drawing from the bountiful evidence of servicemember abuse at the hands of

predatory lenders, the DoD concluded it could not "prevent predatory lending without

assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

27.    To curb usurious interest rates, excessive annual percentage rates (APRs), and

bogus fees, the DoD requested legislation that would prevent lenders from preying on service

members and endangering the nation's military readiness.[16]

28.    The American Bar Association and others expressed support for the DoD's

request, noting the urgent need for remedial Congressional action to curb predatory loan

practices harming Service members. The legislation requested was supported by the DoD,

military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-

based organizations, and of course lawmakers.

29.    Congress answered the call and passed the MLA to protect Covered Members

from unfair, deceptive, and excessively priced loans.

**b.    The Military Lending Act**

30.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10

U.S.C. § 987 *et seq.*, was enacted.

31.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate

of interest greater than 36 percent with respect to the consumer credit extended to a Covered

Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

---

[14] *Id.* at 41–42.

[15] *Id.* at 46.

[16] Specifically, the DoD requested legislation protecting Service members "from unfair,
deceptive lending practices and usurious interest rates and to require uniform disclosure of
credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad
checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles.
All costs involved in borrowing should be included in interest rate calculations and disclosures.
Laws and regulations must be changed to close regulatory loopholes that leave non-resident
military borrowers unprotected in many states." *Id.*

32. The MLA also requires mandatory disclosures in "consumer credit"[17] transactions with Covered Members, which include:

    a. A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

    b. Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

    c. A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

33. Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that requires the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

34. The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

**c.     The Truth in Lending Act**

35. The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

36. Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Albert offers here. Albert fails to make any of the following required disclosures:

    a. "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

---

[17] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

b. "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

c. "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

d. "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

e. "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

f. "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

g. "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

h. "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

i. "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.* at § 1638(12).

**d.    The Georgia Payday Loan Act**

37.    Payday lending refers to a short-term, high-cost form of lending, requiring consumers to repay small dollar loans on their next payday.

38.    This form of lending has been around for more than a century, with its defining feature being the varying attempts that lenders have created to evade the law.

39.    Historically, payday lending took the form of "salary" or "wage buying," where

lenders would claim that they were purchasing earned wages, even though they were really loaning money at excessive rates.

40.    Georgia enacted the Industrial Loan Act ("ILA") to regulate payday lending, and stop the various evasions that lenders used to circumvent the law.

41.    Georgia sought to stop payday lending because short-term, high-cost loans can create a cycle of debt.

42.    This occurs because the high fees charged on this form of credit eat into paychecks, which reduces the amount borrowers receive on payday, requiring borrowers to take out new loans to fill the gap created by original loans.

43.    Unfortunately, the ILA proved insufficient to stop payday lending in Georgia and payday loans resurfaced in the 1990s and 2000s in novel forms.

44.    For instance, many lenders described their transactions as "deferred presentments," whereby lenders would advance cash to borrowers in return for a post-dated check for the amount of the advance and a fee, which the borrower agreed the lender could cash on payday.

45.    Recognizing that the ILA did not provide sufficient deterrence to stop these evasions, Georgia enacted the Payday Lending Act ("PLA") to cease payday lending in the state.

46.    The PLA "encompasses all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements," O.C.G.A. § 16-17-1(a), prohibits payday lenders from collecting any amounts on payday loans, deems payday loans void and unenforceable, and makes payday lenders liable to borrowers for damages in an amount equal to three times any charges made on an illegal payday loan, *id.* § 16-17-3.

47.    Despite the PLA, payday lending has resurfaced yet again in Georgia—this time in the form of EWA providers' cash-advance loan product (including Albert's), which offers cash to borrowers in return for the authorization to debit the borrower's bank account on their payday in an amount equal to the principal cash-advance loan amount and any additional

charges.

48.    Albert's Instant Cash product falls within the scope of the PLA because Instant Cash is a "transaction[] in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a).

## VI.    FACTS

### a.    The Earned Wage Product Market and Albert

#### i.    EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health

49.    A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

50.    Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—was created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

51.    EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages.[18] Loaned funds are repaid via automated withdrawal from the consumer's bank account.

52.    Defendant Albert is a fintech company that provides an EWA product, which it calls "Albert Instant." Albert markets its product as a cash advance with statements like: "Set up Instant to advance up to $250 in minutes."

53.    To repay these loans, users must authorize Albert to charge their debit card or initiate an electronic fund transfer from a bank account. According to its terms of service, cash

---

[18] To be sure, cash advance products like Albert's are also offered to individuals who are unemployed but receive regular direct deposits through, for instance, pensions or government benefits.

advance repayments are "due six (6) days from when you initially advance ('**Repayment Period**')."

54.    EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

55.    Albert generally makes money on its Albert Instant product through two types of fees: (1) **expedite fees** charged for fast access to cash advances, and (2) **subscription charges** that are presented to users as mandatory in order to use Albert's application.

56.    First, **expedite fees** (which Albert calls "Instant Transfer Fees") are charged to provide instant access to loan funds to external bank accounts. For access to cash advances "within minutes," Albert charges a fee ranging from $5.99 to $14.99.

57.    The actual cost to provide customers with instant access to funds is less than $0.05.[19]

58.    The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is for Albert customers a *six-day* liquidity problem.

59.    Albert's website, application, and advertisements include numerous representations about the speed of access to funds, including the very name of the "Albert *Instant*" cash product, as well as promises to deliver funds "in minutes."

60.    While Instant Transfer Fees are notionally optional, in Albert's case, the free option is difficult to access and negates the advances' usefulness to consumers. First and foremost, a consumer wishing to obtain an Albert cash advance into an external bank account (*i.e.*, an account that is not maintained by Albert or its affiliate) *must* pay an Instant Transfer Fee. It is impossible for a consumer to receive an Albert cash advance to an external account without paying an Instant Transfer Fee.

---

[19] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

61.     Albert purports to offer a fee-free cash advance to users who direct their Albert cash advances to an "Albert Cash" account, which is a "debit card and demand deposit account" offered by Sutton Bank (an Albert affiliate) on Albert's digital platform. Allowing for *free* transfers only for consumers who fundamentally change the way in which they spend money is inconvenient and negates the usefulness of the cash advance product which is designed for users who are in immediate need of money.

62.     Upon information and belief, the vast majority of Albert users pay Instant Transfer Fees when taking out Albert Instant cash advances.

63.     Turning to the third type of fee, **subscription charges** are monthly fees Albert charges its users to use its application.

64.     Credit Genie forces users signing up to its service through its app to agree to a monthly fee (between $11.99 and $21.99) in order to use its application. Varying additional services are made available depending whether the user opts for a Basic ($11.99 per month) plan, Genius ($16.99 per month) plan, or Genius+ ($21.99 per month) plan—but in all cases, users accessing Albert's service through the app must enroll in a monthly auto-renewing subscription plan to use Albert's app and Instant Cash product.

65.     Below is a screenshot Albert shows users signing up to use its app (which is necessary to request an Instant Cash) advance:



*Figure 1*

66.    Nowhere on the screen above, or anywhere navigable from this screen, are consumers able to sign up to use Albert's app and Instant Cash product without paying an auto-renewing subscription fee. There is no mechanism available through Albert's app to sign up for Instant Cash Advances without agreeing to pay subscription charges.

67.    When properly viewing EWA products' expedite fees and subscription charges as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

68.    A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:



*Figure 2*

69.     The APR received by Albert for its Instant cash product is similar and *often higher*, with some of Albert's loans to Plaintiffs exceeding **700%** APR (without even including the expensive subscription fees). *See infra*.

70.     Ironically, Albert and other EWA providers market their products as low-cost alternatives to payday loans. In truth, Albert is a wolf in sheep's clothing: extending loans with APRs even more expensive than the exorbitantly-priced payday loans it claims to replace.

71.     On top of charging loan-shark interest rates, Albert and others limit the amount a borrower can access, while simultaneously allowing multiple advances per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips. Albert limits the amount of funds available through an advance to an amount between $25 and $250 but allows users to "take out additional advances up to your limit" during each Repayment Period.[20] Likewise, Albert's six-day repayment period is remarkably brief, resulting in a rapid cycle of "Instant" loans, with repayments and fees depleting borrowers' paychecks and increasing their dependence on more cash advances.

72.     This architecture maximizes fees for EWA providers like Albert, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in

---

[20] *How does Instant advance repayment work?*, https://help.albert.com/hc/en-us/articles/360041602373-How-does-Instant-advance-repayment-work (last visited Mar. 19, 2025).

16

a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[21]

73.    The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

74.    A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[22] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

75.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[23]

### ii.    EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect

76.    While EWA products are financially disastrous for consumers, they have proven profitable for the companies selling them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are

---

[21] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

[22] Wang, Constantine, Burks, Farahi, *A Loan Shark In Your Pocket*, CENTER FOR RESPONSIBLE LENDING at 7 (Oct. 2024).

[23] Constantine, Bamona, Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING at 6 (Oct. 2024).

timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

77.     Albert acknowledges on its website that "[n]ot all customers will qualify" for Albert Instant cash advances.

78.     To qualify for an Albert Instant loan, borrowers must first access the Albert app or web portal, create an account, and link an "active bank account" with a "long transaction history" to Albert. [24]

79.     To determine whether a borrower is creditworthy, and decide how much credit to extend, Albert requires users to connect their accounts to Albert through Plaid. Plaid is a financial services provider that partners with Albert and other fintech companies to allow them to view customer banking information. Plaid allows Albert to "[q]uickly verify assets and income" of borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[25]

80.     Albert uses its real-time insight into customer financials to ensure borrowers will have sufficient funds to repay their loans at the end of the six-day repayment period (*i.e.*, in the underwriting process). In short, through Plaid, Albert has constantly updating visibility of all transactions in connected accounts to monitor borrowers' financial condition.

81.     Through its access to, and perpetual review of, borrowers' financial accounts, Albert is continually assessing the creditworthiness of its borrowers, and the attendant risk of offering them credit. In determining whether, and how much, credit to extend its borrower customers, Albert considers:

- **Account activity**: an active bank account is linked to Albert

- **Transaction history**: an account with a long transaction history is linked to Albert

---

[24] *How do I qualify for advances with Instant?*, https://help.albert.com/hc/en-us/articles/360041602433-How-do-I-qualify-for-advances-with-Instant (last visited Mar. 19, 2025).

[25] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 13, 2025).

- **Direct deposit**: set up qualifying direct deposits with Albert Cash to potentially raise your instant limit[26]

82.    Albert also considers "prior Albert Instant usage and the history and activity of the accounts linked to Albert[.]"

83.    Albert's underwriting process is both rigorous and continual. Albert "regularly review[s] [borrowers'] account[s] to calculate [their] eligibility and may adjust [their] Instant limit. This means [borrowers'] Instant limit may increase or decrease over time."[27]

84.    Again, qualifying for a cash advance is by no means guaranteed and Albert notes on its website that "[n]ot all customers will qualify." Upon information and belief, a substantial proportion of users who seek a cash advance from Albert are denied access based on Albert's assessment (based on its underwriting practices) that the users pose a high default risk.[28]

85.    And for those who qualify, Albert strictly monitors their financial health to determine how much credit the borrowers can take on and reliably repay. Albert determines how much credit to offer its borrowers based on their prior Albert Instant usage and the activity of the accounts linked to Albert. Through its constant underwriting process, Albert extends loans to borrowers only when it is confident they will repay.

86.    For borrowers that qualify, Albert generally begins by offering relatively low amounts of cash, like $25 or $50. Borrowers obtain greater access to credit—*i.e.*, Albert will raise their loan limit—by consistently paying off loans to Albert on time and otherwise improving the health of their linked accounts, by, *i.e.*, earning more money and maintaining a higher balance.

---

[26] *How do I qualify for advances with Instant?*, HELP.ALBERT.COM, https://help.albert.com/hc/en-us/articles/360041602433-How-do-I-qualify-for-advances-with-Instant (last visited Mar. 19, 2025).

[27] *How do you determine my advance limit?*, HELP.ALBERT.COM, https://help.albert.com/hc/en-us/articles/360041602233-How-do-you-determine-my-advance-limit (last visited Mar. 19, 2025).

[28] For one of Albert's competitors who offers a substantially similar product and utilizes similar underwriting procedures, "approximately 20% [of its users] have been denied access to cash advances entirely." *Fed. Trade Comm'n v. Bridge IT, Inc.*, No. 1:23-cv-09651, Compl., ECF No. 1 (S.D.N.Y. Nov. 11, 2023) ("Brigit FTC Compl.").

87.    Upon information and belief, Albert restricts access to its largest loans to a select few of its borrowers.[29]

88.    These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[30] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like Albert directly review borrowers' financial accounts—is one without a difference.

89.    In addition to these rigorous loan qualification procedures, Albert requires its borrowers to pre-authorize Albert to debit their chosen payment method on the scheduled repayment date. "Advances are due 6 days from when [borrowers] initially advance."

90.    When a user requests an Instant Cash Advance loan, the Albert app automatically schedules the repayment for the borrower's next payday and requires the borrower to check a box agreeing that "Albert will initiate an automatic repayment on [repayment date]."

91.    The Albert app does not include a mechanism to cancel an Instant Cash Advance repayment once an advance has been issued.

92.    In addition, the Albert app does not allow a user to delete or remove the linked debit card from their account (which users must authorize Albert to debit for loan repayments

[29] The Federal Trade Commission found that Albert's competitor, Brigit, offered access to its largest cash advance amount ($250) to "only approximately 1% of Brigit Plus customers." Brigit FTC Compl., ¶ 34.

[30] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

and subscriptions when they create an account) once they have subscribed and/or taken out a loan. Users may replace their debit card but may not delete it. Accordingly, Albert deprives users of a mechanism through the app for cancelling a loan repayment.

93.    To collect from users with insufficient funds to afford repayment, Albert requires users to authorize Albert to debit a portion of the total amount based on the user's available balance as reported to Albert through the linked bank connection and debit the remainder "at any time thereafter" (*i.e.*, when Albert detects additional funds it can use to collect repayment).

94.    Borrowers must be current on all their prior Albert Instant loans in order to be eligible for an advance.

95.    In sum, Albert's underwriting process requires, before any money changes hands, that borrowers: (1) sign up for an account with Albert; (2) demonstrate they receive qualifying direct deposits from an employer, payroll provider, or benefits provider; (3) link the bank account to which regular deposits are made to Albert through Plaid; (4) authorize Albert to automatically debit the linked accounts in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; and (5) be current on all previous Albert Instant loans. Borrowers who fail to complete each of these steps cannot obtain cash advances.

96.    Additionally, if a borrower is unable to repay a loan, Albert prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

97.    Albert's app confirms that borrowers owe Albert repayment of their Instant Cash advances in several ways. In addition to pre-authorizing Albert to collect repayment, borrowers must confirm the repayment date selected by Albert at the time they take out the cash advance. Moreover, when an Instant Cash Advance has been taken out but not yet repaid, the Albert app shows users "Advance details" including the "Balance due" and "Due date" for repayment, as shown below:

*Figure 3*

98.    Through these underwriting procedures and policies, Albert ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account at the end of the Repayment Period.

99.    These debt collection methods are so successful that lenders recoup their advances at least 97% of the time using these tactics.[31]

**b.    Albert's Loans to Plaintiffs**

100.    Plaintiff CPO Feeman is currently an active servicemember in the U.S. Navy stationed at Fort Bragg in Cumberland County, North Carolina.

101.    He has been an active duty servicemember since 2009 and will remain on active duty until at least 2028.

102.    Plaintiff Sgt. Bailey is currently an active-duty petty officer stationed at Fort Stewart in Fort Stewart, Georgia.

103.    He is an active duty servicemember and has been since March 2021.

104.    Albert extended consumer credit to Plaintiffs in the form of Instant Cash loan transactions like those discussed above.

105.    Plaintiffs used the loans from Albert for personal, family, or household purposes.

106.    Plaintiffs paid Albert's finance charges, in the form of Instant Transfer Fees and subscription fees, to obtain cash-advance loans.

---

[31] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

107.    A small selection of exemplar Albert Instant loans made by Albert to Plaintiffs are shown in the below tables, with the estimated cost of credit and APR included:[32]

*Table 1 (Instant Cash Loans Made to CPO Feeman)*

| Date Loan Period | Principal Amount | Instant Transfer Fee | APR |
|---|---|---|---|
| 1/3/25–1/9/25 (6 days) | $150.00 | $9.99 | 405% |

*Table 2 (Instant Cash Loans Made to Sgt. Bailey)*

| Date Loan Period | Principal Amount | Instant Transfer Fee | APR |
|---|---|---|---|
| 1/4/25–1/10/25 (6 days) | $50.00 | $5.99 | 729% |
| 3/7/25–3/13/25 (6 days) | $50.00 | $5.99 | 729% |
| 4/27/25–5/4/25 (7 days) | $50.00 | $5.99 | 625% |

108.    Plaintiffs have received multiple usurious loans from Albert since they began using the service.

109.    The Instant Transfer Fees and subscription fees charged with their loans are immediately and directly connected to Albert's extensions of credit to Plaintiffs.

110.    Further, Albert's credit agreement required Plaintiffs to purportedly waive their right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

111.    Albert's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

112.    In connection with its Instant Cash loan transactions, Albert also uses a check or other method of access (*i.e.*, pre-authorized account debit) to a deposit, savings, or other financial account maintained by the borrower as security for the obligation.

---

[32] These calculations are demonstrative only and do not include, for instance, the subscription fees which must be included in the military APR calculation pursuant to 32 C.F.R. § 232.4(c)(1)(iii)(C).

# VII.    CLASS ALLEGATIONS

113.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated and the general public. The proposed "MLA Class," the "TILA Class," and "Georgia Class" (collectively the "Classes") are defined as follows:

**MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Albert to use a cash advance product (including Albert Instant), in which Albert was paid a finance charge (including, without limitation, an expedited ("Instant") transfer fee or subscription charge).

**TILA Class**: All individuals in the United States that entered into an agreement with Albert to use a cash advance product (including Albert Instant), in which Albert was paid a finance charge (including, without limitation, an expedited ("Instant") transfer fee or subscription charge).

**TILA Class**: All Georgia residents that entered into an agreement with Albert to use a cash advance product (including Albert Instant), in which Albert was paid a finance charge (including, without limitation, an expedited ("Instant") transfer fee or subscription charge).

114.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Albert and any entity in which Albert has a controlling interest, or which has a controlling interest in Albert, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

115.    Plaintiffs reserve the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

## Numerosity and Ascertainability

116.    Plaintiffs are unable to state the precise number of members of the Classes because such information is in the exclusive control of Albert. Albert's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable. Albert has made millions of loans, and Plaintiffs estimate there are, at least many thousands of consumers in the MLA Class, TILA Class, and Georgia Class. As a result, Plaintiffs believe that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class

members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of Albert.

117.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable from information and records in Albert's possession, custody, or control.

<u>**Commonality**</u>

118.    There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that Albert has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

    a.   Whether Plaintiffs and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;

    b.   Whether Albert is a "creditor" subject to the protections and limitations of the MLA;

    c.   Whether Albert's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

    d.   Whether Albert made loans (as that term is understood under O.C.G.A. § 16-17-2) to Sgt. Bailey and the Georgia Class;

    e.   Whether Albert entered into standard form loan agreements with Covered Members;

    f.   Whether Albert's loans exceed the MLA statutory rate cap of 36% MAPR;

    g.   Whether Albert's loans exceed the Georgia statutory usury cap;

    h.   Whether Albert failed to provide required MLA disclosure in violation of the MLA;

    i.   Whether Albert's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

    j.   Whether Albert's standard form loan agreements contain an arbitration clause in violation of the MLA;

k.  Whether Albert failed to provide required credit disclosures in violation of the
MLA and TILA;

l.  Whether each month that Plaintiffs and the Class members paid money to Albert
it restarted the statute of limitations under the MLA;

m.  Whether Class members are entitled to actual or statutory damages for the
aforementioned violations and, if so, in what amounts;

n.  Whether Albert should be enjoined from continuing its lending practices in the
manner challenged herein;

o.  Whether Albert is subject to punitive damages, and, if so, the proper measure of
such damages and remedies to which Plaintiffs and the Classes are entitled under
10 U.S.C. § 987(f)(5); and

p.  Any declaratory and/or injunctive relief to which the Classes are entitled.

### **Typicality**

119.  The claims and defenses of Plaintiffs are typical of the claims and defenses of the
MLA Class because Plaintiffs are Covered Members and their loan agreements with Albert are
typical of the type of personal, household, or family loans that Albert normally provides to
Covered Members. Additionally, Albert uses the same or substantially similar standard form
loan agreement in all of its lending transactions. The documents involved in the transaction
were standard form documents and the violations are statutory in nature.

120.  For similar reasons, the claims and defenses of Plaintiffs are typical of the claims
and defenses of the TILA Class. Plaintiffs suffered damages of the same type and in the same
manner as the Classes he seeks to represent. There is nothing peculiar about Plaintiffs' claims.

121.  Additionally, and for similar reasons, the claims and defenses of Sgt. Bailey are
typical of the claims and defenses of the Georgia Class because Sgt. Bailey suffered damages of
the same type and in the same manner as the Georgia Class he seeks to represent and there is
nothing peculiar about his claim.

**Adequate Representation**

122.   Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Plaintiffs hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Plaintiffs have no conflict of interest that will interfere with maintenance of this class action.

123.   Plaintiffs and their counsel are committed to vigorously prosecuting the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

**Predominance and Superiority**

124.   The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class members' claims in a single stroke. There are no significant individual questions of liability or damages whatsoever, and certainly not ones that predominate over issues common to the Classes.

125.   A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

   a.   The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

   b.   Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

c. The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

126. Albert has acted and refused to act on grounds generally applicable to the Classes, thereby making declaratory relief and corresponding final injunctive relief under the Federal Rules of Civil Procedure appropriate with respect to the Classes. Albert should be enjoined from making loans to Covered Members in violation of the MLA, TILA, and Georgia PLA and a declaration should be made that the loans are void from inception.

127. The proposed Classes fulfill the certification criteria of Federal Rule of Civil Procedure 23.

## VIII.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF MILITARY LENDING ACT

128. Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1-127 above.

129. Plaintiffs bring this claim on behalf of themselves and the MLA Class.

130. The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

131. A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

132. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4. The MAPR therefore includes the Instant Transfer Fees and subscription charges imposed by Albert.

133. Plaintiffs and the MLA Class members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an

account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

134.    Plaintiffs are considered "Covered Members" with respect to their Albert loan agreements because Plaintiffs are active-duty service members who are obligated by law to repay loans they took out for personal, family or household purposes.

135.    Albert is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

136.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

137.    Albert charged Plaintiffs and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

138.    Albert fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

139.    Albert's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

140.    Albert's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

141.    Albert's standard form loan agreements also use a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation.

142.    As a result, Albert violates 10 U.S.C. § 987.

143.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiffs seek an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

144.    Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT II

### VIOLATIONS OF THE TRUTH IN LENDING ACT

145.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1-127 above.

146.    Plaintiffs bring this claim on behalf of themselves and the TILA Class.

147.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Albert's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

148.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

149.    Albert is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

150.    Albert has not provided such disclosures before consummation of the loan agreements.

151.    Albert failed to provide such disclosures to Plaintiffs and the TILA Class.

152.    As a result, Albert violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

153.    Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiffs seek an order from the Court awarding actual damages and statutory damages and attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT III

### VIOLATION OF THE GEORGIA PAYDAY LOAN ACT

154.    Plaintiff Bailey re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–127 above.

155.    Plaintiff Bailey brings this claim individually and on behalf of the Georgia Class.

156.    Defendant is engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less. O.C.G.A. § 16-17-2(a), (b).

157.    Defendant is not a bank or credit union and is not licensed under any Georgia law to engage in that business.

158.    Defendant does not meet any of the statutory exceptions to the general prohibition against the making of loans of $3,000.00 or less. See O.C.G.A. § 16-17-2(a)(1)-(4).

159.    Plaintiff Bailey and the Georgia Class are borrowers residing in Georgia who obtained cash-advance loans from Defendant and paid interest and other charges in connection with those loans.

160.    Defendant advanced funds to Plaintiff Bailey to be repaid at a later date.

161.    Defendant's conduct described herein violated and continues to violate the PLA, which means that the loans of Plaintiff Bailey and the Georgia Class were void ab initio, that Defendant is barred from collecting any amounts on those loans, and that Defendant is additionally liable to Plaintiff and the members of the Georgia Class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

162.    Accordingly, Plaintiff Bailey, individually and on behalf of the Georgia Class, requests: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any tips, fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiff's and the Georgia Class members' loans are void ab initio; (iv) and an order

prohibiting Defendant from attempting to debit Plaintiff Bailey's or the Georgia Class members' bank accounts to repay any cash advances.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter an Order:

a. That the Court determine that this action may be litigated as a class action and that Plaintiffs and their counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against Albert and in favor of Plaintiffs and the Classes on all counts;

c. That the Court find and declare that that Plaintiffs and MLA Class members' standard form loan agreements violate the MLA;

d. That the Court find and declare that Albert violated the MLA and award Plaintiffs and MLA Class members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e. That the Court award Plaintiffs and MLA Class members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. That the Court find and declare that Albert violated TILA and award Plaintiffs and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

g. An order awarding the members of the Class actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

h. An order providing Plaintiffs and the members of the Classes restitution for any principal, interest, fees, or other charges paid to Defendant;

i. An order declaring the cash advances that Plaintiff Bailey and the Georgia Class members obtained were or are void ab initio;

j. That the Court enjoin Albert from continuing to engage in predatory lending practices in violation of the MLA, TILA, and PLA;

k. That Albert be required by this Court's Order to compensate Plaintiffs' counsel

for their attorneys' fees and costs of suit, and that Albert be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

l.  That the Court award interest as allowable by law;

m.  That the Court award reasonable attorneys' fees as provided by applicable law, including under the MILA, the TILA, the PLA, and/or Code of Civil Procedure § 1021.5;

n.  That the Court award all costs of suit; and

o.  That the Court award such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: May 13, 2025                    Respectfully submitted,

WADE KILPELA SLADE LLP

*/s/Gillian L. Wade*
Gillian L. Wade, State Bar No. 229124
Marc A. Castaneda, State Bar No. 299001
2450 Colorado Ave., Ste. 100E
Santa Monica, California 90404
Telephone: (310) 396-9600
Email: gwade@waykayslay.com
Email: marc@waykayslay.com

JACOBSON PHILLIPS PLLC
Joshua R. Jacobson (*pro hac vice* forthcoming)
2277 Lee Road, Ste. B
Winter Park, FL 32789
Telephone: (321) 447-6461
Email: joshua@jacobsonphillips.com

CARNEY BATES & PULLIAM, PLLC
Joseph Henry (Hank) Bates, III,
State Bar No. 167688
Lee Lowther (*pro hac vice*)
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500
Email: hbates@cbplaw.com
Email: llowther@cbplaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Plaintiffs Robert Feeman, Bradley
Bailey and the Proposed Classes*